# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL E. MILLER, | ) | CASE NO. 1:24-CV-378-JPC |
| | ) | |
| Plaintiff, | ) | JUDGE J. PHILIP CALABRESE |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |
| | ) | |

## I.       INTRODUCTION

The Commissioner of Social Security denied Plaintiff Michael E. Miller's application for Disability Insurance Benefits (DIB). Mr. Miller seeks judicial review of that decision pursuant to 42 U.S.C. § 405(g). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule 72.2(b). (*See* ECF non-document entry dated February 29, 2024).

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the Commissioner's decision.

## II.      PROCEDURAL HISTORY

### A.       Previous Application for Benefits

Mr. Miller previously applied for DIB in 1990, when he was 18 years old. (Tr. 146–47.) The application was denied, and the agency destroyed the application folder in the intervening decades. (*Id.*)

### B.       Current Application for Benefits

On August 30, 2021, Mr. Miller applied to the Social Security Administration (SSA) seeking period of disability and DIB benefits; he claimed that he became disabled on August 23,

2021. (Tr. 125.)[1] He identified three allegedly disabling conditions: (1) "cranial defect due to surgery from a stroke," (2) "loss of feeling on entire left side of body," and (3) epilepsy. (Tr. 139.) He wrote that he had "a plate in [his] head from a stroke that [he] suffered in [his] childhood," which had "left [him] with a major defect" such that he had "no feeling" on the left side of his body "[a]nd that now has evolved to something that is far worse out of [his] control"—epilepsy. (Tr. 144–45.)

The Social Security Administration ("SSA") denied Mr. Miller's application initially and upon reconsideration. (Tr. 57, 68, 80–82, 90–93.) Mr. Miller requested a hearing before an administrative law judge ("ALJ"). (Tr. 94–95.) The ALJ held a hearing on January 30, 2023, at which Mr. Miller was represented by counsel. (Tr. 33–56.) Mr. Miller testified, as did an independent vocational expert ("VE"). (*Id.*)

On February 15, 2023, the ALJ issued a written decision finding that Mr. Miller is not disabled. (Tr. 10–22).

Mr. Miller requested agency review of the ALJ's decision, merely referencing his pre-hearing brief. (Tr. 122–24.) On January 8, 2024, the SSA Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On February 29, 2024, Mr. Miller filed his Complaint, challenging the Commissioner's final decision that Mr. Miller is not disabled. (ECF No. 1.) Mr. Miller raises the following assignment of error:

> The ALJ's RFC determination is unsupported by substantial evidence and is the product of legal error because the ALJ improperly evaluated the opinion of consultative examiner Taylor Groneck, Psy.D.

---

[1] The administrative transcript appears at ECF No. 5. I will refer to pages within that transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 22"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 6") and page-identification numbers (e.g., "PageID# 386").

(Pl. Merits Br., ECF No. 6, PageID# 386.)

### III.    BACKGROUND

#### A.    <u>Personal, Educational, and Vocational Experience</u>

Mr. Miller was born in December 1971 and was 49 years old on the date of his application. (Tr. 125). He graduated high school and completed a trade apprenticeship as an electrician. (Tr. 14.) He is married, has children, and lives with his family. (Tr. 50, 125–26, 161). He worked as a union electrician from 1994 until August 2021. (Tr. 140, 151.)

#### B.    <u>Function Report</u>

Mr. Miller completed a function report (Form SSA-3373) on January 19, 2022. (Tr. 161–68.)

Mr. Miller wrote that he believed he was able to pay attention consistently but did not follow spoken instructions well. (Tr. 166.) He said he got along well with authority figures and handled stress "ok" because "I try not to think about it." (Tr. 167.) He described having difficulty with changes in his routine "but it is also a part of life." (*Id.*) He did not identify any negative effects of his condition on his ability to complete tasks, concentrate, understand, follow instructions, or get along with others. (*See* Tr. 166.) He reported no issues getting along with family, friends, neighbors, or other people. (*See* Tr. 165.) He wrote that there has been no change in his ability to enjoy his hobbies and interests, including watching television, playing chess, and listening to music. (*Id.*) He identified that he had no difficulty managing finances. (*See* Tr. 164.) But he identified an "unusual . . . fear[]" over his seizure condition, writing that "a seizure could be deadly" because he has a plate in his head. (Tr. 167)

#### <u>Seizure Witness Questionnaire</u>

Mr. Miller's spouse—Tracy Love—completed a seizure witness questionnaire on January

3

19, 2022. (Tr. 159–60.) Ms. Love stated that she has known Mr. Miller for 19 years and sees him every day. (Tr. 159.) She had twice seen him have a seizure, most recently on January 16, 2022. (Tr. 159.) She was also aware that Mr. Miller had an additional seizure while visiting a friend. (Tr. 160.)

Ms. Love described that, during his seizures, Mr. Miller lost consciousness and fell down, lost bladder control, and "had body movement." (Tr. 159.) The seizures lasted "a few minutes." (Tr. 160.) After the seizures, Mr. Miller did not remember the seizure, was "confused and scared," and had "difficulty walking and talking." (*Id.*)

### A.   <u>Relevant Hearing Testimony</u>

#### 1.   *Mr. Miller's Testimony*

Mr. Miller testified that he suffered a stroke as a child, which paralyzed the left side of his body. (Tr. 39.) Mr. Miller described how doctors removed portions of his skull and brain and clipped certain blood vessels in his brain using metal clips, replacing the skull piece with a plastic plate. (Tr. 40.) Mr. Miller relearned how to walk and use the left side of his body but found that he never recovered fully from the stroke; he cannot type using his left hand, cannot tie his shoes, and lacks full dexterity in his left hand. (Tr. 39–40, 49.) Mr. Miller's doctors told him, at the time, that the stroke put him at risk of developing epilepsy. (Tr. 40.)

Despite those difficulties, Mr. Miller became a journeyman electrician and has been a member of an electricians' union for 27 years. (Tr. 37–38.) He worked for several companies over the years, through that union. (*Id.*)

On August 23, 2021, Mr. Miller had a seizure and was diagnosed with epilepsy, diabetes, hypertension, and high cholesterol. (Tr. 39.) He relayed that a doctor at the hospital told him, at that time, that he could not work or drive "forever" because of the condition. (Tr. 50–51.) Mr.

Miller has not worked since that date. (Tr. 39.)

Mr. Miller has continued to have seizures, sometimes just "a few" per week and sometimes more frequently, up to twice a day. (Tr. 43.) The seizures normally last "just a few minutes," but the longest lasted for six minutes. (*Id.*) When he comes out of a seizure, he feels disoriented and nervous; people tell him that, as he is recovering, he tends to repeat himself again and again. (Tr. 40, 43.) It takes him a little over an hour to fully recover from a seizure. (Tr. 43.) Mr. Miller takes an anticonvulsant medication, levetiracetam, which helps control the seizures but makes him "moody and tired." (Tr. 44.) He holds a driver's license but does not drive because he is afraid of losing his life. (Tr. 50.)

Mr. Miller does not treat with a neurologist but sees a primary-care doctor and an internal-medicine doctor; he is focused on treating his diabetes and hypertension. (Tr. 51–52.)

Mr. Miller testified that he wants to go back to work as an electrician, but he is scared to be alone because of his condition and believes it to be a "gamble losing my life" because "any blows to [his] head can be [his] last." (Tr. 40–41.) He said that he does not know what work he would do if he cannot be an electrician. (Tr. 41.) He said he needs benefits to focus on his health, including getting his diabetes under control, with the hope of eventually being able to work again. (Tr. 41–42.)

Mr. Miller described that he also experiences numbness daily on his right side and in his feet and legs. (*Id.*) He can walk for around ten minutes at a time, can stand for ten or fifteen minutes at a time, and cannot sit for "too long" before he begins to feel numb. (Tr. 47–48.)

## 2. *Vocational Expert's Testimony*

Brett Salkin testified as a vocational expert. (Tr. 53.) Mr. Salkin classified Mr. Miller's past work as that of an electrician (DOT 824.261-010), a skilled occupation that is normally

performed at the medium exertional level, but which Mr. Miller actually performed at the heavy exertional level. (Tr. 53.)

The ALJ asked Mr. Salkin one hypothetical question. The ALJ asked him to consider a hypothetical individual with Mr. Miller's age, education, and experience who could perform unskilled work with the following limitations: the person could lift and carry up to 25 pounds frequently and up to 50 pounds occasionally; could occasionally climb ramps and stairs but would never climb ladders, ropes, or scaffolds; could occasionally balance; must avoid all work in unprotected heights or around dangerous moving machinery; and could not drive commercially. (*Id.*) Further, the ALJ asked Mr. Salkin to assume the hypothetical person can understand, remember, and apply information to complete simple instructions and to complete routine work tasks, and would not have hourly rate-type work requirements. (*Id.*)

Mr. Salkin opined that such an individual would be able to perform work that exists in significant numbers in the national economy, including the work of a "dish washer" (DOT 318.687-010), "cleaner" (DOT 323.687-010), or "grocery bagger" (DOT 920.687-014). (Tr. 54.)

On examination by Mr. Miller's counsel, Mr. Salkin testified that a person can be off task no more than ten percent of the time, on average, to maintain employment. (*Id.*) Further, an employee cannot be absent more than once a month on an ongoing basis to maintain employment. (Tr. 54–55.) Mr. Salkin clarified that when a person leaves work early or comes in late, that would count as an "absence event." (Tr. 55.)

B.      **State Agency Consultants**

3.      ***Initial Level***

A disability examiner (Yvonne Stanley), a physician (Maureen Gallagher, D.O.), and a

psychologist (Karla Delcour, Ph.D.) reviewed Mr. Miller's claim at the initial administrative level. (Tr. 57–67.) The consultants found that the opinion of Dr. Groneck, a psychologist, was "persuasive" and "consistent with and supported by the overall evidence."[2] (Tr. 63.) But they concluded that Mr. Miller was of average intelligence and had the ability "to remember, understand, and carry out job instructions that are simple and routine in nature." (Tr. 65.) They opined that he would be able to maintain attention and concentration to complete one- or two-step tasks. (*Id.*) They proposed certain exertional, postural, and environmental limitations due to his history of seizures. (Tr. 63–64.) But they did not find the epilepsy or neurocognitive disorder to be disabling.

Indeed, while they found that Mr. Miller is limited to unskilled work at the medium exertional level, they concluded that he would be capable of performing the work of occupations such as "plate stacker, hand" (DOT 729.687-026), "cleaner, housekeeping, light" (DOT 323.687-014), or "photocopying machine operator, light" (DOT 207.685-014). (Tr. 67.)

Based on these findings, the consultants found that Mr. Miller was not disabled. (*Id.*) The agency sent Mr. Miller notice of the decision, explaining that "[y]our seizures are not frequent, or severe enough, to be considered disabling under our rules" and stating that "although you have some mental problems, you are able to think, communicate, act in your own interest and pursue your usual daily activities." (Tr. 82.)

### 4.    *Reconsideration Level*

At the reconsideration level, a disability examiner (Lindsey Ruffini), a neurologist (Mehr Siddiqui, M.D.) and a psychologist (Audrey Todd, Ph.D.) affirmed the finding that Mr. Miller is not disabled. (Tr. 68–77.) They concluded that the medical evidence "shows good correlation with

---

[2] Dr. Groneck's opinion is discussed below.

limits as represented on the initial RFC." (Tr. 71, 74.)

They concluded that Mr. Miller has the residual functional capacity to perform the work of a "spooling machine operator" (DOT 681.685-114), "continuous towel roller" (DOT 361.685-014), or "room service clerk" (DOT 324.577-010).

In explaining this reconsideration decision to Mr. Miller, the agency wrote that "evidence . . . shows that you can still sit, stand, and walk for extended periods of time, as well as lift light weight" and "despite any emotional problems that you may have, they are not severe enough to significantly affect your daily activities." (Tr. 93.)

### C.    <u>Relevant Medical Evidence[3]</u>

Mr. Miller underwent a clinic interview with psychologist Taylor Groneck, Psy.D., on March 29, 2022. (Tr. 317–22.) The interview was conducted through a telehealth platform. (Tr. 317.) Dr. Groneck noted that Mr. Miller's speech was "slow and deliberate" during the interview, with "long pauses." (Tr. 320.) She wrote that his "psychomotor speed was markedly slowed and he was slow to process questions asked of him." (*Id.*) An assessment revealed that Mr. Miller's short-term memory and working memory "appeared limited" and his "concentration skills were poor." (*Id.*) Dr. Groneck recommended that Mr. Miller undergo a formal cognitive assessment and noted a "rule out" diagnosis of neurocognitive disorder due to epilepsy. (Tr. 321.)

Based the interview, Dr. Groneck opined that Mr. Miller "will likely have problems remembering multi-step job instructions and is likely to require reminders on the job." (Tr. 322.) She further wrote that "[m]emory problems may impact concentration skills in the workplace to a significant extent" and that he "may struggle with workplace demands due to potential neurocognitive deficits." (*Id.*) She explained that Mr. Miller "may have a difficult time organizing

---

[3] Mr. Miller's assignment of error relates solely to the ALJ's consideration of one psychologist's medical assessment of Mr. Miller's possible neurocognitive disorder and its related limitations.

information in order to make independent judgements in a timely manner." (*Id.*) Finally, she opined that Mr. Miller "will likely feel distressed by tasks requiring rapid and timed performance." (*Id.*)

In addition to noting these likely and possible limitations, Dr. Groneck opined that Mr. Miller presented with average intellectual functioning and "would not be expected to have trouble with most simple instructions"; further, while he "may appear withdrawn," he "otherwise appears capable of conforming to social expectations in a work setting." (*Id.*)

## IV.    THE ALJ'S DECISION

The ALJ first determined that Mr. Miller had not engaged in substantial gainful activity since August 23, 2021, the alleged disability-onset date. (Tr. 12).

The ALJ next determined that Mr. Miller had the following severe impairments: epilepsy, diabetes mellitus, and neurocognitive disorder. (*Id.*) The ALJ further found that Mr. Miller had the following non-severe impairments: (1) superficial thrombophlebitis of the left upper extremity in September 2021, resolving, and with no evidence of resulting ongoing functional limitations; (2) hypertension controlled with medication; and (3) obesity. (*Id.*) The ALJ found that these non-severe impairments would have no more than a minimal effect on Mr. Miller's ability to perform basic work activities. (*Id.*)

The ALJ determined, however, that none of Ms. Miller's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 13.)

The ALJ further determined that Mr. Miller had the residual functional capacity ("RFC") to:

> perform medium work as defined in 20 CFR 404.1567(c) except he can lift
> and carry up to 25 pounds frequently and up to 50 pounds occasionally;

> never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance; avoid all work in unprotected heights, around dangerous moving machinery, and no commercial driving; can understand, remember, and apply information to complete simple instructions to complete work tasks that are routine in nature and do not have hourly piece rate type work requirements.

(Tr. 14.)

The ALJ next determined that Mr. Miller is unable to perform his past relevant work as an electrician, relying on the vocational expert's hearing testimony. (Tr. 21.)

However, the ALJ determined that, considering Mr. Miller's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Mr. Miller could perform, including work as a "dishwasher" (DOT 318.687-010), "cleaner" (DOT 323.687-010), or "grocery bagger" (DOT 920.687-014). (Tr. 21–22.) Accordingly, the ALJ determined that Mr. Miller is not disabled. (Tr. 22.)

## V.    LAW & ANALYSIS

### A.    <u>Standard of Review</u>

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations."

*Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

**B.**     **Standard for Disability**

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.

20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

 "A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision,

especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

### C.     Analysis

Mr. Miller contends that the ALJ did not perform "a proper supportability analysis" of Dr. Groneck's psychological evaluation on March 29, 2022. (Pl. Merits Br., ECF No. 6, PageID# 394.) He further argues that the ALJ erroneously considered the opinion to be inconsistent with Mr. Miller's reported symptomology, a fact that Mr. Miller attributes to the ALJ ignoring certain medical records. (*Id.* at PageID# 396–97.) Finally, he contends that the ALJ improperly relied upon his own personal observations at the hearing to discount Dr. Groneck's opinion. (*Id.* at 397.)

At Step Four of the sequential evaluation, the ALJ must determine a claimant's residual functional capacity (RFC) after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In doing so, the ALJ is required to "articulate how she considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). At a minimum, the ALJ must explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors. 20 C.F.R. § 404.1520c(b)(2).[4]

---

[4] Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record. 20 C.F.R. § 404.1520c(c)(3)–(5).

According to the regulations, the more consistent a medical opinion is with the evidence from other medical and nonmedical sources, the more persuasive the medical opinion will be. This is the consistency standard. And the regulation specifies that the more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion, the more persuasive the medical opinion will be. This is the supportability standard. *See* 20 C.F.R. § 404.1520(c)(1)–(2).

Here, in discussing Dr. Groneck's assessment, the ALJ reasoned as follows:

> The severity of the claimant's mental impairment does not meet or medically equal the criteria of Listing 12.02.
>
> . . .
>
> In understanding, remembering, or applying information, the claimant has a moderate limitation. Although . . . Dr. Groneck found some deficits in this area, no medical provider documented problems or deficits in this area. Furthermore, the claimant has average intelligence, he performs household chores, and he is capable of managing his money. The claimant's reasoning and judgment capabilities are sufficient for caring for himself and participating in treatment. . . .
>
> . . .
>
> With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. Although . . . Dr. Groneck found some deficits in this area, no medical provider documented problems or deficits in this area. . . .
>
> As for adapting or managing oneself, the claimant has experienced a moderate limitation. Although . . . Dr. Groneck found some deficits in this area, no medical provider documented problems or deficits in this area.
>
> . . .
>
> Although Dr. Groneck supported her medical opinion with explanations and parts of her mental status examination of the claimant, Dr. Groneck's medical opinion is not fully persuasive because the claimant's presentation/mental state at this one-time evaluation was atypical/not consistent with his presentation/mental state at all other times. . . . In addition, at the hearing, the claimant testified in a lengthy manner, was able

14

to clearly understand questions posed to him, responded appropriately, had clear thought processes, did not answer slowly, and did not ask for questions to be repeated, as he had presented to Dr. [Groneck]. Dr. Groneck's medical opinion is not fully persuasive because it is not supported by the course of treatment. As mentioned above, the claimant did not report any energy level issues or any memory, attention/concentration, or other cognitive issues to any medical provider and no medical provider referred the claimant for formal cognitive testing.

. . .

The undersigned finds that the mental status examination/clinical assessments and course of treatment in this case are not consistent with disabling mental impairment and are more consistent with the stated residual functional capacity. . . . Furthermore, the claimant has not required, received, or sought any type of outpatient mental health services. From all of this, the undersigned finds that the claimant's symptoms and limitations are not as severe as alleged.

(Tr. 13–14, 17–18 (internal citations to the record omitted).)

The Commissioner concedes that the ALJ's discussion of the supportability factor "could have been more robust," but argues that under the regulations the ALJ adequately addressed the supportability and consistency factors. (Def. Merits Br., ECF No. 8, PageID# 407–08, 410.) The Commissioner further argues that substantial evidence supports the ALJ's conclusion that the opinion was "not fully persuasive." (Def. Merits Br., ECF No. 8, PageID# 407–08.) Finally, the Commissioner defends the ALJ's reliance on his own personal observations at the hearing, citing 20 C.F.R. 404.1529(c)(3) and *Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001).

The ALJ, in discussing the opinion of the state agency consulting psychologists, noted that their findings were "somewhat" but "not fully" persuasive. (Tr. 20.) The ALJ reasoned that their findings were "generally supported by the mental status examination by Dr. Groneck," but that the examination was an outlier for the reasons discussed above. (*See id.*) The ALJ concluded that "the claimant can understand, remember, and apply information to complete simple instructions to complete work tasks that are routine in nature and do not have hourly piece rate type work

requirements." (*Id.*)

After a careful review, I agree with Mr. Miller and the Commissioner that the ALJ's discussion of the supportability factor with respect to Dr. Groneck's opinion should have been more robust. The ALJ overwhelmingly focused on the consistency factor. The ALJ's statement that "Dr. Groneck supported her medical opinion with explanations and parts of her mental status examination" is cursory, if not inscrutable, although I note that the ALJ also reasoned that Dr. Groneck's opinion was not supported by a course of treatment.

That said, I find that any error with respect to the ALJ's discussion of supportability or consistency is harmless here.

While "[t]he Sixth Circuit has yet to articulate a harmless error test under the revised § 404.1520c" applicable here, "other district courts have applied the analysis previously used." *Musolff v. Comm'r of Soc. Sec.*, No. 1:21-CV-1739, 2022 WL 1571864, at *13 (N.D. Ohio Apr. 27, 2022) (collecting cases), *report & recommendation adopted*, 2022 WL 1568478 (N.D. Ohio May 17, 2022); *see also Riggio v. Comm'r of Soc. Sec.*, No. 3:22 CV 997, 2023 WL 6225093, at *4 (N.D. Ohio Sept. 26, 2024) ("[C]ourts have applied a harmless error analysis to the articulation requirement regarding [supportability and consistency].").

Here, the functional limitations that the ALJ ultimately incorporated into Mr. Miller's RFC were either consistent with, or more restrictive than, the functional limitations provided by Dr. Groneck. *See Gwendolyn F.H. v. Comm'r of Soc. Sec.*, Case No. 3:22-cv-214, 2023 WL 5772796 (S.D. Ohio Sept. 7, 2023) (holding that the ALJ's failure to articulate how he evaluated the supportability of two medical opinions was harmless where the RFC contained consistent or more restrictive limitations, and collecting cases); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546–47 (6th Cir. 2004) (holding that an error in evaluating a treating physician's opinion under

the previous treating-physician rule may be "irrelevant" where the ALJ nevertheless made findings consistent with that opinion); *Beery v. Comm'r of Soc. Sec.*, 819 F.App'x 405, 408 (6th Cir. 2020) ("We will treat an ALJ's failure to articulate her reasons for the weight she assigned to a medical source opinion as harmless error if the ALJ adopted the opinion or made findings consistent with the opinion.").

First, the ALJ found that Mr. Miller has a severe condition of a neurocognitive disorder, despite Dr. Groneck finding only a "rule out" diagnosis of that disorder.[5] (*See* Tr. 321.) In other words, the ALJ factored the limitations caused by a severe disorder into the RFC, despite the fact that Dr. Groneck did not definitively diagnose the condition and Mr. Miller never underwent the cognitive testing that Dr. Groneck recommended to confirm the extent of any cognitive limitations.

Second, Dr. Groneck opined that Mr. Miller "will likely have problems remembering multi-step job instructions and is likely to require reminders on the job" but "would not be expected to have trouble with most simple instructions." (Tr. 322.) The ALJ's RFC is consistent with that opinion, as it limits Mr. Miller to positions that would have him following "simple instructions to complete work tasks that are routine in nature."

Third, Dr. Groneck opined that Mr. Miller "will likely feel distressed by tasks requiring rapid and timed performance." (Tr. 322.) The ALJ's RFC is consistent with that opinion, too, as it limits Mr. Miller to positions that would "not have hourly piece rate type work requirements."

While Dr. Groneck opined that Mr. Miller may have memory problems that "impact

---

[5] "In the medical context, [a rule-out diagnosis] simply means a diagnosis which is possible, but not yet established." *Rizzo v. Colvin*, Civil Action No. 12-88-DLB, 2013 WL 1345348, * 3 (E.D. Ky. Apr. 1, 2013) (citing *Law v. Barnhart*, 439 F. Supp.2d 296, 307 n.3 (S.D.N.Y. 2006) and *O'Connell v. Astrue*, Case No. 1:06-CV-1113 LEK/VEB, 2009 WL 606155 (N.D.N.Y. Mar. 9, 2009)); *see also, e.g., Lundy v. Wilkie*, 2020 WL 2644006. *2 (Vet. App. May 26, 2020) (stating that a rule-out diagnosis is "'a list of [the] possible diagnoses being considered . . . possibilities to be ruled out' through further diagnostic research and tests") (quoting *Differential diagnoses*, 2 Attorney's Medical Deskbook § 15:17 (4th ed., Oct. 2019 update)).

concentration skills in the workplace to a significant extent," "struggle with workplace demands due to potential neurocognitive deficits," or "have a difficult time organizing information in order to make independent judgements in a timely manner," Dr. Groneck did not opine on any further definite functional limitations from these mere possibilities. Moreover, despite Dr. Groneck's opinion that these possibilities exist (pending further testing, which was never performed), Dr. Groneck nevertheless concluded that she did not expect Mr. Miller to have trouble following simple instructions and stated that Mr. Miller largely appeared "capable of conforming to social expectations in a work setting." (*Id.*) The ALJ's RFC adequately accounts for these opinions.

This is not a case where an ALJ improperly substituted their own opinion for that of a medical professional. *Compare Taynor v. Astrue*, No. 5:12-cv-01782, 2013 WL 1663104, at *6 (N.D. Ohio Apr. 17, 2013). The ALJ found Dr. Groneck's opinion to be not fully persuasive, but, because the ALJ adopted limitations consistent with that opinion, any error in the ALJ's discussion of supportability is harmless.

Mr. Miller's citation to *Taynor v. Astrue* is misplaced because here the ALJ did not completely set aside a treating physician's medical opinion. *Compare Astrue*, 2013 WL 1663104 at *6 ("[T]he ALJ's personal observations of the claimant at the hearing are not an appropriate basis to set aside a treating physician's opinion."). To the contrary, the ALJ adopted Dr. Groneck's functional limitations—despite the lack of confirmatory cognitive testing. The ALJ merely determined that any limitations that do exist are not completely disabling, a position that is not definitively contradicted by the opinion of any medical professional.

Mr. Miller argues that the ALJ ignored a September 22, 2021, note that Mr. Miller endorsed some sleepiness as a side effect of taking seizure medication. (*See* Tr. 247). Mr. Miller similarly argues that the ALJ ignored that he reported "trouble concentrating on things" on October 11,

2021, which, combined with his other symptoms, resulted in a score of "moderate" depression. (Tr. 253–54.)

Viewing the record as a whole, I find no reversible error in the ALJ's conclusions or explanation regarding Dr. Groneck's assessment, and I find that the RFC is supported by substantial evidence.

The standard for "substantial evidence" is "not high." *Biestek*, 139 S.Ct. at 1154. "The substantial-evidence standard . . . presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)). "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)).

"It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered" so long as the ALJ does not "selectivity include[] only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability." *Borawski v. Comm'r of Soc. Sec.*, No. 1:20-CV-01091-JDG, 2021 WL 811717, at *15 (N.D. Ohio Mar. 3, 2021); *see also Smith v. Comm'r of Soc. Sec.*, No. 3:18CV622, 2019 WL 764792, at *9 (N.D. Ohio Feb. 21, 2019) ("While the ALJ must consider all the evidence in the record, there is no requirement that the ALJ discuss all the evidence").

Here, while the ALJ did not discuss each piece of medical evidence individually, her RFC was consistent with those records. Mr. Miller's application focused heavily on his seizure condition, as opposed to mental-health limitations. In his function report, he did not identify any negative effects of his condition on his ability to complete tasks, concentrate, understand, follow instructions, or get along with others. (*See* Tr. 166.) He reported no issues getting along with family, friends, neighbors, or other people. (*See* Tr. 165.) He wrote that there has been no change in his ability to enjoy his hobbies and interests, including watching television, playing chess, and listening to music. (*Id.*) He identified that he had no difficulty managing finances. (*See* Tr. 164.)

The state agency consultants at the initial and reconsideration level found that Mr. Miller's mental limitations were not disabling. (*E.g.*, Tr. 63–65.) And as discussed further above, the RFC is consistent with (or more restrictive than) the limitations proposed by Dr. Groneck after the mental-health assessment.

Mr. Miller candidly stated that he does not know what work he would do if he cannot work his trade as an electrician. (Tr. 41.) But the ALJ reasonably concluded that Mr. Miller has the residual functional capacity to perform other work that exists in the national economy.

Mr. Miller's assignment of error is without merit.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated: December 5, 2024                          */s/ Jennifer Dowdell Armstrong*
                                                  Jennifer Dowdell Armstrong
                                                  U.S. Magistrate Judge


## VII.   NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.** Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a <u>de novo</u> determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018)

(quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).