UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL E. MILLER, | ) | Case No. 1:24-cv-00378 |
| | ) | |
| Plaintiff, | ) | Judge J. Philip Calabrese |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Jennifer Dowdell Armstrong |
| COMMISSIONER OF SOCIAL SECURITY, | ) ) | |
| | ) | |
| Defendant. | ) ) | |

# OPINION AND ORDER

Plaintiff Michael E. Miller applied for disability insurance benefits. The Commissioner of Social Security denied his application, both initially and on reconsideration. After a hearing, an administrative law judge also denied his application. Plaintiff appealed, but the appellate council denied his request for review. Then, Plaintiff filed this action, seeking review in federal court. The Magistrate Judge recommends that the Court affirm the Commissioner's decision, and Plaintiff objects to that recommendation. For the reasons that follow, the Court **OVERRULES** Plaintiff's objection (ECF No. 11), **ADOPTS** the Report and Recommendation (ECF No. 10), and **AFFIRMS** the Commissioner's denial of Plaintiff's application for disability benefits.

## FACTUAL AND PROCEDURAL BACKGROUND

Mr. Miller first applied for disability insurance benefits in 1990, at the age of 18. (ECF No. 5, PageID #167–68.) His application was denied, and the Social

Security Administration destroyed the application folder before his current application. (*Id.*)

Mr. Miller's submitted his current application for disability on August 30, 2021, alleging an onset date of August 23, 2021. (*Id.*, PageID #159–70.) He sought disability due to several conditions: (1) "cranial defect due to surgery from a stroke," (2) "loss of feeling on the entire left side of his body," and (3) epilepsy. (*Id.*, PageID #160.) His claim was denied initially and on reconsideration. (*Id.*, PageID #100, #111.) Plaintiff then requested a hearing before an administrative law judge. (*Id.*, PageID #115–16.)

### A. Evidence Before the Administrative Law Judge

At the hearing before the ALJ on January 30, 2023, the record included the following facts and materials, as relevant here.

#### A.1. Relevant Medical Records

Mr. Miller was born in December 1971 and was 49 years old when he filed this application for disability insurance benefits. (*Id.*, PageID #146.) He is a high school graduate and completed a trade apprenticeship as an electrician. (*Id.*, PageID # 161.)

His medical records show that Mr. Miller was admitted to University Hospitals after a first-time seizure on August 23, 2021. (*Id.*, PageID #253–55 & #331–36.) During his evaluation for the seizure, Mr. Miller was diagnosed with epilepsy, a hernia, painful veins, and hypertension. (*Id.,* PageID #254 & #331.) Subsequently, he applied for disability on August 30, 2021. (*Id.*, PageID #146.)

Following his application, the Ohio Division of Disability Determination referred Mr. Miller for a psychological evaluation. (*Id.*, PageID #338.) On March 29,

2022, Mr. Miller had a telehealth clinical interview with a psychologist, Dr. Taylor Groneck. (*Id.*, PageID #338-44.) Dr. Groneck noted that Mr. Miller's speech was "slow and deliberate with long pauses," but understandable one hundred percent of the time. (*Id.*, PageID #341.) Also, she noted that his psychomotor speed was "markedly slowed" and that he was slow to process questions asked of him. (*Id.*)

In Dr. Groneck's functional assessment of Mr. Miller, she described his intellectual abilities as average and opined that he "understood all questions asked of him" and "would not be expected to have trouble with most simple instructions." (*Id.*, PageID #343.) Dr. Groneck wrote that Mr. Miller "appear[ed] capable of conforming to social expectations in a work setting." (*Id.*) However, she opined that Mr. Miller's short-term memory and working memory abilities were limited and that he "will likely have problems remembering multi-step job instructions and is likely to require reminders on the job." (*Id.*) These memory problems, Dr. Groneck wrote, might impact Mr. Miller's concentration skills in the workplace to a "significant extent." (*Id.*) During the examination, she noted that Mr. Miller's attention and concentration were poor. (*Id.*) Further, she noted that Mr. Miller's work pace "was markedly slowed." (*Id.*)

In describing Mr. Miller's abilities and limitations in responding appropriately to work pressures, Dr. Groneck opined that Mr. Miller reported symptoms and showed signs suggestive of a neurocognitive disorder. (*Id.*) Because of Mr. Miller's "potential neurocognitive deficits," Dr. Groneck wrote that Mr. Miller "may struggle with workplace demands," "have a difficult time organizing information [to] make

3

independent judgments in a timely manner," and "will likely feel distressed by tasks requiring rapid and timed performance." (*Id.*)

Finally, Dr. Groneck found a "rule out" diagnosis of neurocognitive disorder due to epilepsy and recommended that he undergo a formal cognitive assessment. (*Id.*, PageID #342.)

### A.2. Mr. Miller's Testimony

Mr. Miller testified that he suffered a stroke in his childhood that paralyzed the left side of his body. (*Id.*, PageID #60–61.) Then, he described a subsequent procedure he underwent, during which doctors removed parts of his skull and brain, attached metal clips on multiple blood vessels in his head, and placed a plastic plate where the removed portion of his skull had been. (*Id.*, PageID #61.) A doctor told him that the procedure put him at risk of having epilepsy and that once he started having seizures, he would always have them. (*Id.*) Mr. Miller stated that he had to relearn how to walk and find different ways to compensate for his inhibited movement, but that he never fully recovered his dexterity. (*Id.*, PageID #60.)

After recovering from his stroke, Mr. Miller worked for 27 years as a journeyman electrician through his membership in an electricians' union until August 23, 2021, when he started having seizures. (*Id.*, PageID #58–60.) Mr. Miller stated that he was then diagnosed with epilepsy, diabetes, hypertension, and high blood pressure and that a doctor at the hospital told him he could not drive or work "forever" because of his condition. (*Id.*, PageID #72.)

Mr. Miller explained that he continued to experience seizures and that he "might have two in a day, or a few during the week." (*Id.*, PageID #64.) These

seizures typically last a few minutes, with the longest seizure lasting about six minutes. (*Id.*) Before these seizures occur, Mr. Miller starts to feel "weird and strange," like he needs to catch his breath, but he does not remember anything else until the seizure ends, and he experiences something like "coming out of a deep sleep." (*Id.*) When he comes out of the seizures, Mr. Miller feels nervous and repeats himself many times over, according to observers. (*Id.*, PageID #61, #64 & #69.) It takes him a little more than an hour to feel "normal" again after a seizure. (*Id.*, PageID #64.) In addition to his seizures, Mr. Miller described experiencing daily numbness on his right side and in his hands and legs when he stands or sits for longer than ten to fifteen minutes. (*Id.*, PageID #69.)

Mr. Miller testified that he is afraid to be alone because of his condition and fears when his next seizure might occur. (*Id.*, PageID #61-62.) Though he relayed that he would love to go back to work, he also stated that he "[does not] want to . . . try to gamble losing [his] life," because "any blows to [his] head can be [his] last." (*Id.*) Mr. Miller also told the ALJ that, while he does have a driver's license, he does not drive because he does not trust his ability to drive, nor does he want to risk losing his life. (*Id.*)

To help with his seizures, Mr. Miller takes levetiracetam—an anticonvulsant also known as Keppra—that makes him feel "moody and tired." (*Id.*, PageID #65.) He does not have a neurologist since he knows his condition, but he does see a primary care provider and an internal medicine physician. (*Id.*, PageID #72–73.) Mr. Miller said he is focused on trying to manage his diabetes and needs disability benefits so

5

that he can return to better health, work, and the quality of life he had before he started experiencing seizures in August 2021. (*Id.*, PageID #62–63 & #73.)

### A.3. Testimony of Vocational Expert Brett Salkin

A vocational expert, Brett Salkin, testified that Mr. Miller's work history included the occupation of electrician, involving medium exertion. (*Id.*, PageID #74.) According to Salkin, a hypothetical individual of Mr. Miller's age, education, background, work experience, and psychological and physical conditions could not perform his past relevant work. (*Id.*, PageID #74–75.) However, Salkin testified that a hypothetical individual with similar limitations could perform the jobs of a dish washer, cleaner, and grocery bagger, totaling approximately 574,000 jobs in the national economy. (*Id.*, PageID #75.)

Finally, Salkin testified that employers would not tolerate time off task for more than ten percent of the time, on average. (*Id.*, PageID #75–76.) Such employers would find two or more absences a month excessive. (*Id.*, PageID #76.) Salkin clarified that days with late arrival or early departure counted as the equivalent of an "absence event." (*Id.*)

### B. The ALJ's Decision

After taking testimony and considering the record, the ALJ issued a written decision on February 15, 2023, finding that Mr. Miller was not disabled under Sections 216(i) and 223(d) of the Social Security Act. (*Id.*, PageID #31–43.) The ALJ conducted the customary five-step inquiry under 20 C.F.R. § 404.1520(a) to determine whether Mr. Miller was disabled. (*Id.*, PageID #33–43.)

At step one, the ALJ found that Mr. Miller "has not engaged in substantial gainful activity since August 23, 2021," the alleged date of onset. (*Id.*, PageID #33.) At step two, the ALJ determined that Mr. Miller has the following severe impairments: "epilepsy, diabetes mellitus, and neurocognitive disorder." (*Id.*) At step three, the ALJ found that Mr. Miller does not have an impairment or combination of impairments that meets or medically equals the severity of one of the impairments listed in 20 C.F.R. § 404.1520(d). (*Id.*, PageID #34.) In making her findings, the ALJ considered whether the Paragraph B criteria for mental impairment were satisfied. (*Id.*) The satisfaction of Paragraph B criteria requires an extreme limitation of one, or marked limitation of two, areas of mental functioning. *See* 20 C.F.R. § 404.1520.

The ALJ found:

- in understanding, remembering, or applying information, the claimant has a moderate limitation;

- in interacting with others, the claimant has no limitation;

- with regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation; and

- as for adapting or managing oneself, the claimant has a moderate limitation.

(*Id.*, PageID #34–35.) In each of the areas in which the ALJ found that Mr. Miller has a moderate limitation, the ALJ noted that he reported having problems in those areas to Dr. Groneck, and that Dr. Groneck found some deficits in the same. (*Id.*, PageID #34–35.) However, the ALJ ultimately found that Mr. Miller's difficulties in each area were no more than moderate because "no medical provider documented problems or deficits in [each] area." (*Id.*) In the area of understanding, remembering,

7

or applying information, the ALJ cited Dr. Groneck's medical opinion that Mr. Miller "has average intelligence . . . performs household chores . . . is capable of managing his money . . . [and has] reasoning and judgment capabilities [that] are sufficient for caring for himself and participating in treatment." (*Id.*)  Because Mr. Miller's mental impairments do not include two marked limitations or one extreme limitation, the ALJ found that the Paragraph B criteria were not satisfied.  (*Id,* PageID #35.)

At step four, the ALJ found that Mr. Miller had the residual functional capacity to perform medium work:

> [T]he claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c), except he can lift and carry up to 25 pounds frequently and up to 50 pounds occasionally; never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; occasionally balance; avoid all work in unprotected heights, around dangerous moving machinery, and no commercial driving; can understand, remember, and apply information to complete simple instructions to complete work tasks that are routine in nature and do not have hourly piece rate type work requirements.

(*Id.*, PageID #35.)

In making this determination, the ALJ considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence," in addition to "medical opinion(s) and prior administrative medical findings." (*Id.*, PageID #36.)  The ALJ stated that Mr. Miller's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but that his statements concerning the persistence and limiting effects of his symptoms were "not entirely consistent" with the evidence in

8

the record. (*Id.*) In particular, the ALJ clarified that Mr. Miller's allegations were out of proportion to the medical and other evidence. (*Id.*)

On Dr. Groneck's examination of Mr. Miller and medical opinion, the ALJ found that Mr. Miller had "memory problems [that] may impact [his] concentration skills in the workplace to a significant extent." (*Id.*, PageID #38–39.) Finding that that Dr. Groneck's medical opinion was "not fully persuasive," the ALJ explained that Mr. Miller's presentation and mental state at his one-time evaluation with Dr. Groneck was inconsistent with his presentation and mental state at all other times—including at his hearing before the ALJ—and unsupported by his course of treatment. (*Id.*, PageID #39.) For example, the ALJ noted that at his hearing, Mr. Miller testified in a lengthy manner, understood questions posed to him, responded appropriately, and did not ask for questions to be repeated. (*Id.*)

Finally, at step five, the ALJ found that Mr. Miller was unable to perform any past relevant work. (*Id.*, PageID #42.) However, the ALJ determined that Mr. Miller could perform other jobs that exist in significant numbers in the national economy given his age, education, work experience, and residual functional capacity. (*Id.*) Ultimately, the ALJ found that Mr. Miller was not disabled and denied his application. (*Id.*, PageID #43.) The Appeals Council denied further review, rendering the ALJ's decision final on January 8, 2024. (*Id.*, PageID #22.)

### C. Report and Recommendation

Plaintiff timely filed this action on February 29, 2024, seeking judicial review under 42 U.S.C. § 405(g). (ECF No. 1.) Plaintiff makes one argument on appeal: "[t]he ALJ's [determination of residual functional capacity] is unsupported by

substantial evidence and is the product of legal error because the ALJ improperly evaluated the opinion of consultative examiner Taylor Groneck, Psy.D." (ECF No. 6, PageID #386.)

The Magistrate Judge issued a report and recommendation that the Court affirm the ALJ's decision denying Mr. Miller's application for disability. (ECF No. 10.) The Magistrate Judge determined that, although the ALJ's discussion of the supportability factor with respect to Dr. Groneck's opinion "should have been more robust," any error pertaining to the ALJ's discussion of supportability or consistency was harmless. (*Id.*, PageID #435.) The Magistrate Judge explained that the functional limitations the ALJ ultimately incorporated into Mr. Miller's residual functional capacity were either consistent with, or more restrictive than, the functional limitations provided by Dr. Groneck. (*Id.*) To illustrate this point, the Magistrate Judge noted that the ALJ's residual functional capacity finding:

- found that Mr. Miller has a severe condition of a neurocognitive disorder, while Dr. Groneck made only a "rule out" diagnosis of that disorder;

- limited Mr. Miller to positions that would entail following "simple instructions" to complete routine work tasks, consistent with Dr. Groneck's opinion that Mr. Miller "would not be expected to have trouble with most simple instructions";

- limited Mr. Miller to positions that "would not have hourly piece rate type work requirements," consistent with Dr. Groneck's opinion that Mr. Miller "will likely feel distressed by tasks requiring rapid and timed performance"; and

- accounted for Dr. Groneck's opinion that Mr. Miller appeared "capable of conforming to social expectations in a work setting."

(*Id.*, PageID #436–37 & #342–43.)

10

Viewing the record as a whole, the Magistrate Judge found no reversible error in the ALJ's conclusions or explanations of Dr. Groneck's assessment. (*Id.*, PageID #438.) Further, the Magistrate Judge determined that substantial evidence supported the ALJ's finding on Mr. Miller's residual functional capacity. 42 U.S.C. § 405(g).

### D. Plaintiff's Objection

Plaintiff timely objected to the Magistrate Judge's report and recommendation, raising a single objection. (ECF No. 11.) Plaintiff objects to the Magistrate Judge's finding that any error in the ALJ's discussion of the supportability or consistency of Dr. Groneck's medical opinion is harmless. (*Id.*, PageID #442.) In his objection, Plaintiff reiterates several arguments raised in his brief on the merits and in his response to the Commissioner's brief. (ECF Nos. 6 & 9.) Plaintiff argues that the ALJ failed to state in her decision that she was incorporating a limitation of requiring reminders on the job into her residual functional capacity determination. (ECF No.11, PageID #443.) Plaintiff also argues that the Magistrate Judge failed to discuss, and the ALJ failed to incorporate into her residual functional capacity determination, a limitation of "markedly slowed work pace," in accordance with Dr. Groneck's findings. (*Id.*, PageID #443–44.)

## STANDARD OF REVIEW

The Court reviews de novo the portions of a Magistrate Judge's report and recommendation to which specific objections are made. 28 U.S.C. § 636(b)(1)(C); *United States v. Walters,* 638 F.2d 947, 949–50 (6th Cir. 1981). "De novo review requires the Court to re-examine the relevant evidence a magistrate judge reviewed

11

to determine whether to accept, reject, or modify the report and recommendation." *Scott v. Saul,* No. 1:19-cv-2393, 2021 U.S. Dist. LEXIS 92052, at *12-13 (N.D. Ohio May 14, 2021); *see* 28 U.S.C. 636(b).

When a party objects, review is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record and by reviewing any legal errors. *Wright v. Massanari,* 321 F.3d 611, 614–15 (6th Cir. 2003). "Substantial evidence" is more than a scintilla, but less than a preponderance. *Rogers v. Commissioner of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007). Substantial evidence is relevant evidence that a "reasonable mind might accept as adequate to support a conclusion." *Id.* If substantial evidence supports the Commissioner's findings, then the Court accepts them as conclusive, even if it would have reached a different outcome on the same facts. 42 U.S.C. § 405(g).

## ANALYSIS

Plaintiff objects to the Magistrate Judge's finding that any error in the ALJ's discussion of the supportability or consistency of Dr. Groneck's opinion would be harmless. (ECF No. 11, PageID #442–43.) In her report and recommendation, the Magistrate Judge found that Dr. Groneck's opinion was not fully persuasive but still found that the ALJ adopted limitations consistent or more restrictive than those found in Dr. Groneck's opinion. (ECF No. 10, PageID #435.) On de novo review based on Plaintiff's objection, the Court agrees.

At Step Four of the sequential evaluation of a claimant, the ALJ must determine the claimant's residual functional capacity after considering all the medical and other evidence in the record. 20 C.F.R. § 404.1520(e). In making this

determination, the ALJ "must articulate how [she] considered the medical opinions and prior administrative medical findings." 20 C.F.R. § 404.1520c(a). The most important and minimum factors an ALJ considers when evaluating the persuasiveness of medical opinions and prior administrative findings are supportability and consistency. 20 C.F.R. § 404.1520c(b)(2).

The Sixth Circuit has not yet addressed if or when an ALJ's failure to properly analyze a medical opinion for supportability and consistency under the revised § 404.1520c(b)(2) can be excused as harmless error. Other district courts, however, have applied the harmless error standard when evaluating an ALJ's treatment of a treating physician's opinion for applications after the revision. *Musolff v. Comm'r of Soc. Sec.*, No. 1:21-cv-1739, 2022 WL 1571864, at *13 (N.D. Ohio May 17, 2022) (collecting cases); *see also Riggio v. Comm'r of Soc. Sec.*, No. 3:22 CV 997, 2023 WL 622093, at *4 (N.D. Ohio Sept. 26, 2024). "The Sixth Circuit has defined an error as harmless when it neither deprives a party of a substantial procedural right nor prejudices the party on the merits of the matter." *Drescher v. Comm'r of Soc. Sec.*, 656 F.Supp.3d 765, 771 (N.D. Ohio Feb. 16, 2023).

### I. Limitation of Needing Reminders on the Job

Plaintiff objects to the Magistrate Judge's harmless error determination because the ALJ failed to incorporate a limitation requiring reminders on the job into the residual functional capacity. (ECF No. 11, PageID #443.) Plaintiff contends that needing reminders in a work environment could result in a finding of disability, making the report and recommendation inconsistent with the testimony of the vocational expert. (ECF No. 11, PageID #443.) He cites several cases where a

vocational expert testified that needing reminders could limit the number of jobs available to an individual. (*Id.*) The Commissioner maintains that the ALJ's finding of Mr. Miller's residual functional capacity was actually more restrictive. (ECF No. 12, PageID #447.) Further, the ALJ's finding that Mr. Miller was limited to simple tasks and instructions did not present "a definitive limitation that can be compared with RFC finding limitations." (*Id.*)

Dr. Groneck's report notes that Mr. Miller "will likely have problems remembering multi-step job instructions and is likely to require reminders on the job." (ECF No. 5, PageID #343.) The ALJ's residual functional capacity defines Mr. Miller's ability to understand, remember, and apply information to the completion of "simple instructions to complete work tasks that are routine in nature." (*Id.*, PageID #35.) The Magistrate Judge held that the residual function capacity as articulated by the ALJ captured Dr. Groneck's full notation. (ECF No. 10, PageID #427.) The Court agrees that Dr. Groneck's assessment that Plaintiff "likely needs reminders," especially taking this assessment in the context of multi-step job instructions, is consistent with the residual functional capacity—that Plaintiff would not have trouble with simple instructions for work tasks that are routine in nature.

Moreover, Dr. Groneck opined that Plaintiff would likely need reminders, but she did "not provide a specific limit" for Plaintiff. *Knapp v. Berryhill*, No. 5:18-cv-01779, 2019 WL 3365415, at 11 (N.D. Ohio May 13, 2019). Additionally, the qualifier of "likely" does not help Plaintiff's attempt to make this opinion a concrete limitation.

Because the ALJ did not err in not directly including "likely needs reminders" in the residual functional capacity, the ALJ was not required to pose a hypothetical question to the vocational expert that included Plaintiff needing reminders. A hypothetical "need not include all the claimants diagnoses, but should merely reflect the RFC . . . as well as the claimant's vocational factors of age, experience, and education." *McVey v. Commissioner of Soc. Sec.*, No. 2:10-cv-231, 2012 WL 966484, at *3 (E.D. Tenn. Mar. 21, 2012) (citing *Webb v. Commissioner of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004)).

## II.  Limitation of a Markedly Slow Work Pace

Plaintiff also argues that harmless error cannot apply because the Magistrate Judge failed to discuss the limitation that Dr. Groneck identified, requiring a "markedly slowed" work pace for Mr. Miller. (ECF No. 5, PageID #343.) The Commissioner contends that Magistrate Judge did not need to address the opinion regarding the "markedly slow" work pace because when in context the note refers to Dr. Groneck's perception of Mr. Miller during the evaluation, not a comment on his workplace pace. (ECF No. 12, PageID #448.) But the paragraph in Dr. Groneck's report containing this statement contains the opinion that "memory problems may impact concentration skills in the workplace to a significant extent." (ECF No. 5, PageID #343.) Therefore, it is not clear whether the statement identifies a limitation.

But the Court does not review this question de novo, just for substantial evidence. In doing so, it does not substitute its judgment for that of the ALJ. On that score, sufficient evidence (more than a scintilla) supports the residual functional capacity that the ALJ determined. In any event, the ALJ's finding appears to be

consistent with this alleged limitation by, among other things, limiting Mr. Miller to "simple instructions to complete work tasks that are routine in nature and do not have hourly piece rate type work requirements." (ECF No. 5, PageID #35.) Accordingly, the Court agrees with the Magistrate Judge that any error was harmless.

## CONCLUSION

For the foregoing reasons, the Court **OVERRULES** Plaintiff's objections (ECF No. 11), **ADOPTS** the Magistrate Judge's Report and Recommendation (ECF No. 10), and **AFFIRMS** the Commissioner's denial of disability insurance benefits.

**SO ORDERED.**

Dated: March 31, 2025

_____
J. Philip Calabrese
United States District Judge
Northern District of Ohio